FILED

2016 Mar-03  PM 01:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CHARLES YATES,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:14-CV-582-RDP** |
| | } | |
| **CITY OF BIRMINGHAM,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

This matter is before the court on Defendant's Motion for Summary Judgment. (Doc. # 18). The Motion has been fully briefed. (Docs. # 19, 23, and 26). Also before the court is Defendant's Motion to Strike (Doc. # 27), which has also been fully briefed. (Docs. # 30 and 33).

### I.      Summary of Relevant Facts

If facts are in dispute, they are stated in the manner most favorable to the non-movant, and all reasonable doubts about the facts have been resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993); *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox. v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994).[1]

---

[1] Asserted "facts" that are not facts at all will be disregarded. *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) (conclusory allegations without specific supporting facts have no probative value). For example, Plaintiff presents the following as an "undisputed fact" in his brief: "Beginning in February 2010, Yates, a Caucasian, was subjected to racial discrimination by the City's final policy makers …"

A.      The Players

Defendant, the City of Birmingham is a municipal government under the laws of the State of Alabama.  (Doc. # 1 ¶ 21).  The City has an Equal Employment Opportunity policy, and supervisors are trained on the policy.  (Doc. # 20-1 at 25-26, 43-44; Doc. # 20-2 ¶ 3, Attach. 1).

Plaintiff Charles Yates is a Caucasian who is employed by the City as the Building Facilities Manager at the Birmingham Museum of Art. (Doc. # 1 ¶¶ 4, 56; Doc. # 20-3 at 27, 33-34).  Yates began his employment with the City in 1997 holding various positions including Facilities Manager. (Doc. # 1 ¶ 25, Doc. # 20-3 at 28-29).

In 2008, Plaintiff was appointed by former Mayor Larry Langford to a Deputy Director of Public Works – Facilities position. (Doc. # 1 ¶ 25, Doc. # 20-3 at 49, 52, 61, Ex. 3).  Plaintiff's supervisor was Ricky Kennedy, the Director of Public Works, and there were five other Public Works Deputy Directors.  (Doc. # 20-3 at 47, 58, 61).  All of these Deputy Directors were political appointments and, as appointed personnel, served at the discretion of the Mayor.  (Doc. # 20-3 at 49-52; Doc. # 20-4 at 13; Doc. # 20-5 at 33-34).   Although Plaintiff was a Deputy Director over the City's various facilities, under Mayor Langford, he was frequently at City Hall.  (Doc. # 20-3 at 65-66).

On or about January 26, 2010, William A. Bell, Sr. became the Mayor.  (Doc. # 20-4 at 10).  Shortly thereafter, Jarvis Patton was appointed as the Chief of Operations for Mayor Bell.  (Doc. # 20-5 at 22, 28).  Mayor Bell also replaced Ricky Kennedy (black male) as the Director of Public Works with Adlai Trone (black male).  (Doc. # 20-4 at 34; Doc. # 20-7 at 11).

---

(Doc. # 23 at 6).  It frankly strains credulity for Plaintiff to suggest this "fact" is undisputed.  Conclusory allegations of this type will be disregarded for summary judgment purposes.

B.      The Events in Question

In their briefs, the parties have discussed a number of events that bear upon Plaintiffs'

claims. There is no easy way to present those in the narrative of this opinion.   The court

discusses these events in as coherent a manner as possible.

On or about February 12, 2010, Trone told Plaintiff that he stayed at City Hall too much.

(Doc. # 20-7 at 32-33, 39-41).  Trone believed Plaintiff needed to be at other facilities to perform

his job.  (Doc. # 20-7 at 32-33, 39-41).  Under Mayor Langford Plaintiff had direct access to

approve requisitions; consequently, when he was at City Hall people frequently asked him to

order or purchase things.  Trone explained that he believed this would occur less often if Plaintiff

was not seen at City Hall as much - "out of sight out of mind."  (Doc. # 20-7 at 32-33, 39-41).

"It was a financial thing."  (Doc. # 20-7 at 41).

Plaintiff contends that Trone told him that Mayor Bell and Patton did not want to see his

"white face" in City Hall and that he had to use the stairs rather than the elevator in City Hall.

(Doc. # 1 ¶ 26, Doc. # 20-3 at 95-97; Doc. # 20-1 Ex. 4).  Thereafter, Plaintiff asked Trone's

permission when he wanted to go to City Hall.  (Doc. # 20-3 at 155-56).  Although Trone did not

tell Plaintiff he was required to do so, Plaintiff believed he had to obtain permission every time

he wanted to go to City Hall and routinely asked permission from Trone to enter City Hall.

(Doc. # 23-16 at ¶13 &17; Doc. # 23-13 at ¶16).

Trone testified that he told Plaintiff to use his discretion when he needed to go to City

Hall.  (Doc. # 20-7 43-45, 58).  Plaintiff testified that, when he asked to go to City Hall, Trone

told him to "get in and get out" using the service elevator or stairwell. (Doc. # 23-16 at ¶13 &17;

Doc. # 23-13 at ¶16).  Plaintiff testified that, on one occasion when he asked permission to visit

City Hall, Trone said, "I am going to get you." (Doc. # 23-13 at ¶17).

3

Prior to being told he was at City Hall too much, Plaintiff attended all meetings as the representative from Public Works concerning the operation and management of all City facilities and equipment. (Doc. # 23-18 at ¶7; Doc. # 23-16 at ¶13-14 and Resume at p. 2; Doc. # 23-20 at 6-9; Doc. # 20-3 at 61). As of October 22, 2010, Plaintiff no longer sought permission to enter City Hall, but instead simply used the stairwell or service elevator. (Doc. # 20-7 at 52; Doc. # 20-3 at 103, 156-158; Doc. # 20-1 at 65).

Plaintiff told Peggy Polk, while she was the Deputy Director of the City Personnel Department, that Mayor Bell and Patton had barred him from City Hall because of his race. (Doc. # 20-3 at 78-79, 103, 108-109, 111, 114-117; Doc. # 23-16 at ¶16; Doc. # 20-1 at 65). Polk denies that Plaintiff told her this was because of his race, but she called Trone and Patton to explain they could not bar Plaintiff from City Hall. (Doc. # 20-1 at 56-57, 65).

On February 18, 2010, Trone notified Plaintiff (and copied the Mayor's office staff) that his right to enter and approve requisitions had been terminated, and that the clerical employee who had previously entered requisitions for Plaintiff would have to have requisitions approved by her supervisor, Naomi Owens. (Doc. # 20-7 at 23, 63 and Ex. 4; Doc. # 23-23 at ¶5-6, 13-15). Normally, requisitions are entered by administrative and accounting staff, not Deputy Directors or Directors. (Doc. # 20-6 at 67). Trone believed that no Deputy Director or Facility Manager should have the right to go into the system and enter a requisition himself and approve it himself. None of the other Deputy Directors had that authority, nor did they have clerks assisting them. (Doc. # 20-7 at 34-36). Trone also retrieved Plaintiff's City phone, radio, and car keys. (Doc. # 23-13 at ¶15; Doc. # 20-6 at 55-58, Ex. 9 at 1; Doc. # 23-23 at ¶14). Sometime later, Plaintiff asserts that a fellow Deputy Director, Al Hickman took possession of Yates' work

and vendor files.  (Doc. # 23-13 at ¶15).  Department Directors are permitted to reassign duties among Deputy Directors and reassign staff.  (Doc. # 20-3 115; Doc. # 20-1 at 74-75, 89).

After Mayor Bell took office, all of the Deputy Directors in Public Works were concerned they would lose their jobs because the City Council had questioned the need for the existing number of Deputy Directors.  (Doc. # 20-7 53-54).  Trone told Plaintiff that if any of the Deputy Directors had to be rolled back into their old jobs, it would be Plaintiff and another Deputy Director, Reginald Servant, because they were the newest Deputy Directors.  (Doc. # 20-7 at 65).

Plaintiff spoke with Peggy Polk about his concerns of remaining a Deputy Director.  Polk told Plaintiff that, if anything happened, he had the right to roll back to his former position.  (Doc. # 20-1 at 63, 68, 75-77).  On February 22, 2010, Plaintiff requested that he be allowed to roll back to his former position when it became vacant, and Polk told him his request would be honored.  (Doc. # 20-1 Ex. 5).  If Plaintiff had been terminated as Deputy Director before his position became vacant, the City would have created another Facility Services Manager position for him to roll back into.  (Doc. # 20-1 at 84-88).  To the contrary, Plaintiff claims that Trone told him that the Personnel Board would not allow Plaintiff roll-back because he had not completed his probationary period as Facilities Manager prior to being promoted to Deputy Director in 2008. (Doc. # 20-3 at 146; Doc. # 20-1 Ex. 8; Doc. # 23-13 at 23).

On May 13, 2010, Mayor Bell sent letters to all appointed personnel, including Plaintiff, informing them that their employment with the City was terminated but that they could request reappointment if they did so by June 4, 2010.  The letter also stated that employees who failed to request reappointment by that date were assumed to not be interested in retaining their appointed

position.  (Doc. # 20-3 at 119-22, Ex. 5; Doc. # 20-1 at 93; Doc. # 20-4 at 14-16; Doc. # 20-5 at 29, 32-33, Ex. 3; Doc. # 20-7 at 70).

On June 4, 2010, Plaintiff submitted his written request for re-appointment by having three copies hand delivered to the Mayor, Chief of Staff Faush, and Patton. (Doc. # 20-3 at 123-124; Doc. # 23-23 at ¶¶ 8, 9; Doc. # 23-13 at ¶18).  On or about June 18, 2010, Patton telephoned Plaintiff to inform him he was terminated because he had failed to request re-appointment, but when Plaintiff informed Patton that he had turned in a request for reappointment, Patton told him he would look into it.  (Doc. # 20-3 at 127-28, 139; Doc. # 20-5 at 79-80).

Thereafter, Mayor Bell offered Plaintiff reappointment as a Deputy Director. (Doc. # 20-3 at 125, 130, Ex. 7; Doc. # 20-4 at 15; Doc. # 20-5 Ex. 2).  On June 25, 2010, however, Plaintiff sent an official request to roll back into his former position which was to become vacant on July 2, 2010.  (Doc. # 20-3 at 149, Ex. 9; Doc. # 20-1 at 101, Exs. 6, 10).  On July 1, 2010, Patton met with Plaintiff to discuss his reappointment, but Plaintiff told Patton he was going to decline the position and that he had requested a rollback to his prior position.  (Doc. # 20-3 at 130-32, 137-38, 140-41, 144, Ex. 8).

Polk delayed Plaintiff's rollback during June and July because she knew Patton was going to meet with Plaintiff about reappointment and she hoped he would accept; however, Polk told Plaintiff that he would not be harmed by that delay.  (Doc. # 20-1 at 107, Ex. 12).  Plaintiff did not change his mind about the reappointment, and effective July 30, 2010, Plaintiff rolled back to Facilities Manager.  (Doc. # 20-3 at 144, 151-52, Ex. 10).  Plaintiff's decision to roll back to his old position resulted in a $22,000 annual pay reduction.  (Doc. # 20-3 at 30-31 & Ex. 10; Doc. # 20-6 at 8; Doc. # 23-13 at ¶24).

Kevin Moore, an African-American, was appointed to replace Plaintiff as a Deputy Director and became Plaintiff's supervisor. (Doc. # 20-8 at 14, 16-19, 20-22, 68-69 Ex. 5 at p 2). Moore was not trained in any skilled trade. Instead, he had experience in accounting and as a budget analyst, and had supervised accounting staff. (Doc. # 20-8 at 16-23, 73; Doc. # 23-13 at ¶25).

On August 11, 2010, Plaintiff discovered that his radio, telephone, and computer did not work. He called Josh Goggins with Information Management System (IMS), who explained it appeared Plaintiff had been set for termination that day. (Doc. # 20-3 at 174-175). Goggins told Plaintiff he would turn his services back on. (Doc. # 20-3 at 75). Patton denies that he ever terminated Plaintiff and further denies that he had the authority to do so. (Doc. # 20-5 at 80).

On a couple of occasions in December 2010, Moore e-mailed Plaintiff and other City Hall staff member about a lack of paper towels and other supplies in the bathrooms at City Hall. (Doc. # 20-8 at 91-100 Ex. 13-16; Doc. # 20-3 at 180-182). Plaintiff testified that Moore called him in for questioning about the alleged paper and soap shortage in the presence of an Administrative Assistant who took notes. (Doc. # 20-3 at 183-185; Doc. # 23-13 at ¶28). Neither Trone nor Moore took any formal disciplinary actions against Plaintiff for this or any other issue. (Doc. # 20-7 at 86; Doc. # 20-8 at 90).

A few months after the April 27, 2011 Tornado, Trone had the idea for the City's Public Works department to adopt a house and conduct some repairs in a manner similar to Habitat for Humanity. (Doc. # 20-7 at 100-01). Materials were gathered, and Public Works employees took them to the home. However, before any work was completed, the City's legal department determined the work project was not permissible. (Doc. # 20-7 at 100-07). No work was ever performed by City employees on the home. (Doc. # 20-7 at 108).

In July 2011, Plaintiff reported to Moore that both he and Paint Supervisor Lee Campbell (a Caucasian) suspected biased hiring based on their suspicion that an applicant, Steve McGlothin (an African American), had prior knowledge of interview questions and answers. Apparently, McGlothin also announced on his Facebook page that he was getting the painter position before the selection took place. (Doc. # 23-19 at ¶4-12; Doc. # 23-13 at ¶30-31; Doc. # 20-6 at Ex. 10).  After making this complaint, Plaintiff and Campbell were no longer involved in interviewing candidates. (Doc. # 23-13 at ¶31).

On or about February 24, 2012, Moore, who was then the Interim Director of the Crossplex and Deputy Director of Public Works, was asked by one of his supervisors to dispatch (and actually dispatched) certain Public Works carpenters to evaluate a chandelier and perform some other work at the Medical Forum Building, a private commercial building in Birmingham. (Doc. # 20-8 at 115-121).  The City often has events at different facilities around the City and City employees sometimes work on those facilities.  (Doc. # 20-8 118).  Upon learning of this project, Plaintiff went on site, and immediately curtailed the operation.  Plaintiff was concerned it would have resulted in disciplinary action against him and his subordinates. (Doc. # 20-6 at 98 Ex. 12; Doc. # 20-8 at 115-121 Ex. 19: Doc. # 20-3 at 185-189).

Later in 2012, a Caucasian carpenter at City Hall complained that two Caucasian carpenters were receiving a disproportionate share of overtime.  (Doc. # 20-6 at 109-11).  There were similar issues which Plaintiff raised about the amount of overtime African American workers at the Crossplex were reporting.  (Doc. # 23-13 at 9).  An African American and a Caucasian electrician had complained that another African American electrician received a disproportionate share of overtime.  (Doc. # 20-6 at 110-115).  At this time, the Crossplex was

no longer under the direction of Public Works.  (Doc. # 20-6 at 114-116, 119-122; Doc. # 23-16 at 3-4).

On or about January 22, 2013, Plaintiff was called to a meeting with Patton, Hickman, and newly appointed Director Stephen Fancher.  (Doc. # 20-3 at 197-199; Doc. # 23-16 at ¶20; Doc. # 20-5 at 96-7).  Hickman believed the meeting was to address something he had done. (Doc. # 20-6 at 99).  Shortly before this meeting, a female employee at the Crossplex informed Patton that Plaintiff had inquired whether Patton ever said anything to her that made her uncomfortable.  (Doc. # 20-5 at 100-01).  At the meeting, Patton questioned Plaintiff about why he was "investigating" Patton and said that he did not appreciate Plaintiff trying to dig up information on him.  (Doc. # 20-5 at 98; Doc. # 23-13 at 9).

This meeting occurred shortly after Virginia Spidle filed a discrimination lawsuit against the City.  (Doc. # 23-13 at 9).  Plaintiff claims that Patton also questioned him in the meeting about allegations in the Spidle complaint that related to Plaintiff, and repeatedly asked Plaintiff to concede that he had been allowed to "roll-back" into his prior job. (Doc. # 20-3 at 197-201; Doc. # 23-16 at ¶20).  When Plaintiff refused to concede that Patton had treated him "right," Patton stated that he was "not afraid" and noted that he had worked as an investigator for the EEOC for ten years.  (Doc. # 20-3 at 200-03).  Plaintiff claims that Patton further stated he knew how to deal with "people like you" and instructed Plaintiff to tell his "little buddy" what he said. (Doc. # 20-3 at 200-203; Doc. # 23-16 at ¶20; Doc. # 20-6 at 103-105).

After this meeting with Patton, Plaintiff testified that he was afraid for his job and experienced shortness of breath and chest pain.  The following day, Plaintiff sought medical treatment and was placed on medication for the first time in his life. (Doc. # 20-3 at 203-206; Doc. # 23-16 at ¶20; Doc. # 20-6 at 101).

On or about January 28, 2013, Plaintiff was in a meeting with the City's Public Information Officer, April Odom.  Patton saw Plaintiff there and went in to speak with him. (Doc. # 20-3 at 215; Doc. # 20-5 at 106-07).  During this meeting, Patton again asked Plaintiff to agree that Patton had been more than fair to him by allowing him to roll back into his former position.  (Doc. # 20-5 at 107-08).  Plaintiff informed Patton that Trone had told him (Plaintiff) that Patton and Mayor Bell did not want to see his white face in City Hall.  (Doc. # 23-13 at 10-11; Doc. # 20-5 at 106-08).  Patton assured Plaintiff that he had said no such thing, and told Plaintiff he could have his Deputy Director job back. (Doc. # 23-13 at 10-11; Doc. # 20-5 at 106-08).

Odom tried to convince Plaintiff to accept reappointment to a Deputy Director position. (Doc. # 20-3 at 217-218; Doc. # 23-13 at ¶37; Doc. # 20-5 at 106-110).  Plaintiff stated that he had concerns about discrimination and retaliation and was reluctant to accept Patton's offer, and he began to cry. Patton then arranged for Plaintiff to meet with Mayor Bell and escorted him to the Mayor's office. (Doc. # 20-3 at 211-222; Doc. # 20-5 at 109-110). Mayor Bell repeated the offer to reappoint Plaintiff to his former Deputy Director position and instructed Plaintiff to meet with Polk to complete his reappointment papers. (Doc. # 20-3 at 222-23; Doc. # 23-13 at ¶39; Doc. # 20-5 at 110).  Plaintiff responded that he needed to think about the offer and talk to his wife.  (Doc. # 20-3 at 216-19)  Plaintiff also informed Patton that he had retained an attorney regarding his employment.  (Doc. # 20-3 at 219-220).

Rather than follow up with Mayor Bell or Patton, or have his attorney speak with the City about the offer of reappointment, Plaintiff's attorney contacted the attorney representing the City in the Spidle litigation about the offer of reappointment to the Deputy Director position.  (Doc. # 23-13 at 11).  Neither Mayor Bell nor Patton followed up with Plaintiff about the offer of

reappointment, despite Plaintiff's request through counsel to discuss the offer.  (Doc. # 20-3 at 222-224; Doc. # 23-13 at ¶39-40).

After Plaintiff's meeting with the Mayor when he was offered the reappointment, two new Deputy Director positions were created in Public Works, bringing the number of Deputy Directors to six.  Plaintiff did not receive either position.  (Doc. # 23-13 at ¶41).

In March 2013, Plaintiff took a week off from work, and on April 11, 2013, he was overcome by stress and suffered pain in his arm and chest.  He was taken by ambulance to UAB Highlands Hospital. (Doc. # 20-3 at 19-23; Doc. # 23-13 at ¶42).

On April 16, 2013, Hickman conducted a performance evaluation of Plaintiff.  This was the first review of Plaintiff's performance since 2005.  Plaintiff had not received evaluations because his pay was "topped out" and, therefore, he was no longer eligible for merit raises. (Doc. # 20-6 at 133 Ex. 14; Doc. # 20-3 at 229-233 and Ex. 10; Doc. # 23-16 at ¶7; Doc. # 20-3 at 232-233; Doc. # 23-13 at ¶43).  In this evaluation, Plaintiff was given two needs improvement ratings because he was responsible for the overtime issues with the carpenters at the Crossplex, which was a contract violation.  Hickman did not perform the evaluation related to the supervisor responsible for assigning the City Hall electricians' overtime. (Doc. # 20-6 at 126-128 and Ex. 13, 14; Doc. # 20-3 at 229-233; Doc. # 23-16 at ¶2, 7).

Yates disputed his 2013 evaluation.  (Doc. # 20-6 Ex. 13).  Under the City's progressive discipline policy, he believed he risked further lowered evaluations. (Doc. # 20-3 at 229-230; Doc. # 23-16 at ¶7).  However, he has received no further discipline because of the evaluation. (Doc. # 20-3 at 232).

In May 2013, Plaintiff was offered a newly created Facilities Manager position at the Birmingham Museum of Art, which he accepted when the City offered to maintain his salary.

(Doc. # 23-13. at ¶44).  At this time, Plaintiff was also given a retroactive pay adjustment for pay he did not receive because the City did not properly credit him with his two (2) years of service as a Deputy Director.  (Doc. # 20-6 50-51 Ex. 8; Doc. # 23-13 at ¶24).

On or about July 10, 2013, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission.  (Doc. 1-1 at 2).  He attached to his charge a ten page statement of particulars related to his claims.  (*Id*. at 3-12).

## II.      Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party has met its burden, the Rule requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial.  *See id*. at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson v. Liberty Lobby, Inc.* teaches, Rule 56(c) "does not allow the plaintiff to simply rest on his allegations made in the complaint; instead, as the party bearing the burden of proof of trial, he must come forward with at least some evidence to support each element essential to his case at trial." *Anderson*, 477 U.S. at 252. "Mere allegations" made by a plaintiff are insufficient. *Id.*

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Southwest Airlines Co.*, 243 F. Supp.2d 1257, 1262 (D.Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so onesided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp.2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp.2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear … that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

III.     Analysis

Plaintiff's Complaint asserts three claims: (1) race discrimination under Title VII and Section 1981, brought through 42 U.S.C. § 1983, asserting a hostile environment claim and a discriminatory lowered evaluation claim (Doc. # 1 at pp. 33-34); (2) retaliation under Title VII and Section 1981, brought through 42 U.S.C. § 1983, asserting no specific adverse action (Doc. # 1 at pp. 35-36); and (3) a claim that Plaintiff's "demotion" in 2010 was unconstitutional and/or retaliatory (Doc. # 1 at 36-37).

Where a plaintiff seeks vindication of rights secured by Section 1981 against a state actor, § 1983 provides the exclusive remedy for obtaining relief. *Butts v. Cnty. of Volusia*, 222 F.3d 891, 893 (11th Cir. 2000) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 731-32 (1989)).  Furthermore, '[w]here, as here, a plaintiff's claims under Title VII are based on the same set of facts as his claims under § 1983, the analysis under Title VII is identical to the analysis under § 1983. [] Thus, the same elements for discrimination and retaliation under [Plaintiff's] Title VII claims apply to [Plaintiff's] § 1983 claims."  *King v. Butts County*, 576 Fed. App'x. 923, 931 (11th Cir. 2014) (citing *Abel v. Dubberly*, 210 F.3d 1334, 1338 & n.3 (11th Cir. 2000)).[2]

A.     **Plaintiff's Hostile Environment Claim**

To establish a hostile environment claim, Plaintiff must show that:

(1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his membership in the protected group; (4) it was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment; and (5) the employer is responsible for that environment under a theory of either vicarious or direct liability.

---

[2] Of course, for Plaintiff's Title VII claims, "a plaintiff must file a timely charge of discrimination with the EEOC within 180 days of the last discriminatory act." *H & R Block E. Enterprises, Inc. v. Morris*, 606 F.3d 1285, 1295 (11th Cir. 2010) (internal citation omitted).  Plaintiff filed his EEOC Charge on July 10, 2013.  (Doc. # 1-1).  Thus, any Title VII claim regarding any discrete employment action occurring before January 2013 is time-barred.

*Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (quotation marks omitted). The first and second elements of a hostile environment are not at issue here.  In its summary judgment brief, Defendant focuses on the third and fourth elements.

When a court addresses the third element of a hostile environment claim, a "bedrock principle [is] that not all objectionable conduct or language amounts to discrimination under Title VII." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir. 2010) (en banc). Therefore, only conduct that is "based on" a protected category, such as race, may be considered in a hostile work environment analysis. *See Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 584 (11th Cir. 2000), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).  'Innocuous statements or conduct, or boorish ones that do not relate to the [race] of the actor or the offended party (the plaintiff), are not counted.'" *Jones*, 683 F.3d at 1297 (quoting *Gupta*, 212 F.3d at 583) (internal citations omitted).

Here, Plaintiff complains of numerous examples of conduct to which he took offense. However, he has only identified one comment which was in any way related to his race — his assertion that Trone told Plaintiff that Mayor Bell and Patton did not want to see his "white face" in City Hall and to use the stairs rather than the elevator while in City Hall. Other purportedly offensive conduct which is unrelated to race is not "based on his membership in the protected group." *Jones*, 683 F.3d at 1292.

To draw the conclusion that *any* of the other alleged offensive conduct was based on race requires reliance on Plaintiff's rank speculation and conjecture about the intent Plaintiff ascribes to other people.  But "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987); *see also Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998)

(conclusory allegations without specific supporting facts have no probative value); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976) (conclusory statements, unsubstantiated by facts in the record, will normally be insufficient to defeat a motion for summary judgment).

Neither Title VII, nor Section 1981, makes the unexplained treatment of someone *per se* illegal, nor does either statue make inconsistent or even irrational employment practices illegal. "The law does not require, nor could it ever realistically require, employers to treat all of their employees all of the time in all matters with absolute, antiseptic, hindsight equality. What the law does require is that an employer not discriminate against an employee on the basis of the employee's protected class characteristics." *E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1319 (10th Cir. 1992). Plaintiff has simply failed to show that he was subjected to any conduct other than one comment (already described) because of his race. Therefore, he has failed to satisfy the third element of his hostile environment claim.

With regard to the fourth element, Plaintiff must show that the harassment which was based on his race was so severe or pervasive as to alter the terms and conditions of employment and create a hostile or abusive working environment. This determination includes both a subjective and objective component. *Jones*, 683 F.3d at 1299. "The burden is on [Plaintiff] to demonstrate that he perceived, *and* that a reasonable person would perceive, the working environment to be hostile or abusive." *Id.* (emphasis added).

Examining first the objective component, in determining whether a reasonable person would perceive the working environment as hostile or abusive, the court must look at the totality of circumstances and consider such matters as "(1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere

offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's job performance." *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1250-51 (11th Cir. 2014) (quoting *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999)) (quotation marks omitted). Conduct is objectively severe when the workplace is permeated with intimidation, ridicule, and insult. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276–77 (11th Cir. 2002). Applying those factors here, regardless of Plaintiff's subjective perception regarding Trone's comment that Mayor Bell and Patton did not want to see Plaintiff's "white face" in City Hall, that one isolated comment simply does not objectively rise to the level of actionable hostile environment.

Because Plaintiff has failed to establish the third and fourth element of an actionable hostile environment, that claim fails as a matter of law.

**B.     Plaintiff's Discrimination Claim**

Plaintiff's Complaint is not a model of clarity regarding the claims which are being asserted by Plaintiff. But the only employment action specified in Count One of the Complaint is a "lowered performance evaluation." (Doc. # 1 at p. 33). The court addresses that claim below.

**1.     May 2013 Lowered Performance Evaluation**

As an initial matter, under the *McDonnell Douglas* burden-shifting framework, a plaintiff must establish a prima facie case of discrimination. Where a plaintiff alleges a discriminatory employment decision, he may establish a prima facie case by showing that (1) he is a member of a protected class, (2) he was qualified for his position, (3) he was subject to an adverse employment action, and (4) his employer treated similarly situated employees outside his protected class more favorably. *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). "If a

plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

If the plaintiff establishes a prima facie case of discrimination, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255 (11th Cir. 2012). If the defendant proffers a nondiscriminatory reason, the burden returns to the plaintiff, who must show that the proffered reason is pretextual. *Id*. The plaintiff can demonstrate pretext by exposing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the defendant's reasoning. *Springer v. Convergys Customer Mgmt. Grp. Inc*., 509 F.3d 1344, 1348 (11th Cir. 2007).

### a.      Plaintiff Did Not Suffer an Actionable Adverse Employment Action

As a threshold matter, Defendant questions whether Plaintiff has identified an actionable adverse employment action relating to his "lowered performance evaluation." This is important because, as the Eleventh Circuit has noted, the definition of adverse employment action in the context of a retaliation claim is much broader than that applicable to a discrimination claim. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Crawford v. Carroll,* 529 F.3d 961, 974 (11th Cir. 2008). "An employment action is considered sufficiently 'adverse' to be actionable under federal discrimination statutes 'only if it results in some *tangible, negative effect* on the plaintiff's employment.'" *Andazola v. Logan's Roadhouse Inc.,* 871 F.Supp.2d 1186, 1206-7 (N.D. Ala. 2012) (quoting *Lucas v. W.W. Grainger, Inc.,* 257 F.3d 1249, 1261 (11th Cir. 2001) (addressing an ADA retaliation claim) (emphasis supplied). A retaliation claim is analyzed differently. In the retaliation context, a materially adverse action "means it well might have dissuaded a reasonable worker from making or supporting a charge of

discrimination" or "a reasonable employee would have found the challenged action materially adverse." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68; *Crawford*, 529 F.3d at 974.

Addressing Plaintiff's discrimination claim, the court notes that the Eleventh Circuit has held that "memoranda of reprimand or counseling that amount to no more than a mere scolding, without any following disciplinary action, do not rise to the level of adverse employment actions sufficient to satisfy the requirements of Title VII." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1236 (11th Cir. 2001) (quotation and alteration omitted). The negative evaluation must actually lead to a material change in the terms or conditions of employment, such as "an evaluation that directly disentitles an employee to a raise of any significance." *Gillis v. Georgia Dept. of Corr.*, 400 F.3d 883, 888 (11th Cir. 2005). Although proof of direct economic consequences is not required in all cases, "the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Davis*, 245 F.3d at 1239.

Plaintiff argues that he believed that the "lowered" performance evaluation was part of Defendant building a "case" to fire him.  However, he has presented no evidence at all to support his subjective belief.  Simply stated, Plaintiff has failed to establish his prima facie case of discrimination because he has not come forward with substantial evidence showing that the performance evaluation at issue actually led to any tangible effect on his employment.  After all, Title VII "focuses on the effects of the action on the employee rather than the motivation of the employer." *Smith v. City of Jackson*, 544 U.S. 228, 235-36 (2005).  Inferences based on speculation and conjecture are not reasonable. *Avenue CLO Fund, Ltd. v. Bank of Am., NA*, 723 F.3d 1287, 1294 (11th Cir. 2013).  Plaintiff's "lowered" performance evaluation had no tangible impact on his employment; therefore, it was not an actionable adverse employment action.[3]

---

[3] To the extent that Plaintiff asserts that either his 2010 roll back to his former position, or his transfer to the museum (events mentioned only in Count 1 of Plaintiff's Complaint), were discriminatory, neither of these

### b.    Plaintiff Has Not Identified an Appropriate Comparator

Even if Plaintiff could show that a lowered evaluation was an actionable adverse employment action (and, to be clear, he cannot), Plaintiff has not presented any evidence (much less substantial evidence) that the way he was evaluated was due to his race.[4]  For example, he has not identified that he was treated less favorably than a similarly situated employee outside of his protected category.  A proper comparator is an employee outside of the plaintiff's protected category who is "similarly situated in all relevant respects." *Holifield*, 115 F.3d at 1562; *accord Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1280 (11th Cir. 2008).  "In order to be considered 'similarly situated,' the compared employees must have been 'involved in or accused of the same or similar conduct,' yet 'disciplined in different ways' for that conduct." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 n.17 (11th Cir. 2011) (citing *Holifield*, 115 F.3d at 1562); *see also Maniccia*, 171 F.3d at 1364 ("The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed."). The Eleventh Circuit has interpreted this standard to "require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia*, 171 F.3d at 1368.

Plaintiff was given a lowered performance evaluation by Hickman because, after a (white) carpenter complained about other (white) carpenters receiving favorable projects,

---

decisions are actionable adverse employment actions because even Plaintiff concedes they were voluntary decisions which he himself made.  "A transfer that is found to be 'purely voluntary' cannot be considered adverse." *Allen v. U.S. Postmaster Gen.*, 158 F. App'x 240, 243 (11th Cir. 2005) (*quoting Doe v. Dekalb County School Dist.*, 145 F.3d 1441, 1454 (11th Cir. 1998)); *see also Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 447–50 (6th Cir.1999) (An effective resignation does not constitute an adverse action. "Plaintiff failed to establish that he suffered an adverse employment decision because he voluntarily resigned.").

[4] Trone's comment that Bell and Patton did not want to see Plaintiff's "white face" in City Hall is not relevant to show that Hickman had a discriminatory intent in conducting his evaluation of Plaintiff.  Hickman was not identified as someone who did not want to see Plaintiff's "white face."  *See Evans v. McClain of Ga. Inc.*, 131 F.3d 957, 962 (11th Cir. 1997) (holding that stray remarks made by a non-decision maker is not sufficient for showing discriminatory intent).

Hickman investigated the matter and found the complaint to be justified and to be a violation of the LIU agreement. Hickman considered this contract violation when evaluating Plaintiff and giving him two "needs improvement" ratings.

Plaintiff asserts that supervisors responsible for rotating the electricians' overtime at the Crossplex did not receive similar lowered performance evaluations. However, those supervisors were assigned to the Crossplex, not Public Works, and, in any event, Hickman did not perform their evaluations. (Doc. # 20-6 at 126-128 and Ex. 13 &14; Doc. # 20-3 at 229-233; Doc. # 23-16 at ¶2, 7). The fact that different supervisors made the disciplinary recommendations "is not dispositive itself," but "it does serve to [] distinguish their situations." *Moore v. Alabama Department of Corrections*, 137 F. App'x 235, 239 (11th Cir. 2005). The existence of a common decision maker is a factor a court considers in determining whether a plaintiff and a comparator were similarly situated. *See Silvera v. Orange Cty. Sch. Bd.*, 244 F.3d 1253, 1261 n.5 (11th Cir. 2001) (recognizing that "differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination").

At bottom, even if Plaintiff had suffered an actionable adverse employment action (which he did not), he simply has not shown that there is a similarly situated employee who was treated differently than him. Because Plaintiff has failed to establish either the third or fourth element of a disparate treatment claim related to his "lowered" evaluation, that claim fails as a matter of law.

### C.    Plaintiff's Retaliation Claim

Count Two of Plaintiff's Complaint asserts a retaliation claim. Interestingly, however, nowhere in that Count does Plaintiff identify with any particularity any employment decision that Plaintiff challenges as being retaliatory. As noted above, a Title VII claim based upon

21

Plaintiff's July 2013 EEOC charge and directed at any discrete employment action occurring before January 2013 is time-barred.  The longest possible statute of limitations applicable to Plaintiff's Section 1981 claims is four years.  *Baker v. Birmingham Bd. of Educ*., 531 F.3d 1336, 1339 (11th Cir. 2008).  Plaintiff's Complaint was filed on March 28, 2014.  Therefore, any employment actions taking place before March 28, 2010 are time-barred.[5]

To establish a prima facie case of retaliation, a plaintiff must show that: (1) he participated in a protected activity; (2) he suffered a materially adverse employment action; and (3) there was a causal connection between the plaintiff's participation in the protected activity and the adverse employment action. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162-63 (11th Cir. 1993) (Title VII, Section 1981); *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008) (Section 1981); *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (Section 1983).

As noted above, an "adverse employment action" in the retaliation context does not carry the restrictive definition that it does in the discrimination setting.  *Burlington N. & Santa Fe Ry*, 548 U.S. at 64.  In evaluating a retaliation claim, the test is whether "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 68 (quotations omitted). Further, "the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters."  *Id*. at 69. "The anti-retaliation provision [of Title VII] protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id*. at 67. The Supreme Court has stated that "material adversity" is distinguishable from mere "trivial harms." *Id*. at 68.

---

[5] The conversation in which Trone allegedly told Plaintiff that  Mayor Bell and Patton did not want to see his "white face" in City Hall occurred on or about February 12, 2010. (Doc. # 20-7 at 32-33, 39-41; Doc. # 1 ¶ 26, Doc. # 20-3 at 95-97; Doc. # 20-1 Ex. 4).  Plaintiff's ability to right to enter and approve requisitions was terminated on February 18, 2010.  (Doc. # 20-7 at 23, 63 and Ex. 4; Doc. # 23-23 at ¶5-6, 13-15).  Any claim as to these events is time barred.

### 1.   Plaintiff's 2010 Roll Back to His Former Position

Plaintiff turned down reappointment to the Deputy Director position in the summer of 2010.  The evidence shows that, although there was some confusion over whether Plaintiff had submitted his letter requesting reappointment, he was offered reappointment to that position.  But in the end, it was Plaintiff's decision to roll back to his former position.  Plaintiff's alleged fears about taking the position are not sufficient to establish a constructive demotion.  Courts evaluate the nature of the allegedly unbearable conditions under an objective standard, and do not take the "subjective feelings" of the plaintiff into account. *Giles v. BellSouth Telecommunications, Inc.*, 542 F. App'x 756, 761 (11th Cir. 2013) (citing *Doe v. Dekalb Cnty. Sch. Dist.*, 145 F.3d 1441, 1450 (11th Cir.1998).

Because it is undisputed that the roll back was voluntary, it cannot constitute an actionable adverse employment decision.  "A transfer that is found to be 'purely voluntary' cannot be considered adverse." *Allen v. U.S. Postmaster Gen.*, 158 F. App'x 240, 243 (11th Cir. 2005) (quoting *Doe v. Dekalb County School Dist.*, 145 F.3d 1441, 1454 (11th Cir.1998).  Moreover, the voluntary nature of the decision to roll back necessarily precludes Plaintiff's ability to satisfy the causation element of his prima facie case.

Because Plaintiff cannot establish either the second or the third element of his retaliation claim related to his roll back, that claim fails as a matter of law.

### 2.   Plaintiff's 2013 Transfer to the Museum

The analysis applicable to Plaintiff's 2010 roll back also applies to Plaintiff's 2013 transfer to the Art Museum.  The move to the Museum does not constitute an adverse employment decision because Plaintiff voluntarily made the move.  Nor does it constitute a constructive demotion through any objective lens. Plaintiff was called by the Museum Director

and told that the job at the Museum was open if he wanted it.  He initially declined and suggested another employee. Later, however, he asked for the job and requested that the City match his current pay.  The City agreed to do so.

Plaintiff claims the move to the Museum was a constructive demotion because he supervises fewer people.  However, diminished responsibilities and reassignment of staff do not qualify as a constructive demotion.[6]  *Rawls v. Ala. Dep't of Human Res.*, 2012 WL 1319495, at *8 (M.D. Ala. Apr. 17, 2012), *aff'd*, 507 F. App'x 895 (11th Cir. 2013).

In any event, Plaintiff voluntarily chose to move to the Museum.  He cannot establish that this move was an adverse decision by Defendant, and he certainly cannot show that it was motivated by any retaliatory intent.  Therefore, Plaintiff cannot establish either the second or third element of a prima facie case of retaliation, and Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

### D.     Plaintiff's Section 1983 Claim

Although the Supreme Court has held that local government entities are "persons" within the scope of Section 1983, and subject to liability, Plaintiff cannot rely upon the theory of *respondeat superior* to hold Defendant liable under Section 1983. *See Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 692 (1978) (finding that Section 1983 "cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor"); *Pembaur v. Cincinatti*, 475 U.S. 469, 479 (1986). "It is only when the 'execution of the government's policy or custom ... inflicts the injury' that the municipality may be held liable." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). A city does not incur Section 1983 liability for alleged injuries caused solely by its employees. *Monell*,

---

[6] Although the court does not moor its dismissal of Plaintiff's 2013 transfer claim on this point, it could be observed that Plaintiff is doing essentially the same duties as he did in his Facility Manager job, but on a smaller scale; he is doing less work for more (*i.e.*, the same) money. (Doc. # 20-3 at 43-45).

436 U.S. at 694. Nor does the fact that a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee infer municipal culpability and causation. *Bd. of County Com'rs v. Brown*, 520 U.S. 397, 403 (1997). Instead, to impose Section 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation. *See Canton*, 489 U.S. at 388.

Count Three of Plaintiff's Complaint alleges that his "demotion" in 2010 was a constitutional violation. As discussed above, however, Plaintiff has failed to establish a prima facie case of discrimination or retaliation with regard to the 2010 roll back to his former position. Mayor Bell offered Plaintiff reappointment as a Deputy Director, but on June 25, 2010, Plaintiff sent an official request to roll back into his former position. On July 1, 2010, Patton met with Plaintiff to discuss his reappointment, but Plaintiff told Patton he was declining the position and that he requested a rollback to his prior position. Under these facts, even if Plaintiff could show that the City had a custom or policy that constituted deliberate indifference to that constitutional right (and, to be sure, he has not made any such showing), he cannot establish that the policy or custom caused his "demotion." The demotion was a direct result of Plaintiff's voluntary election to roll back to his former position. Therefore, he cannot satisfy the elements of his prima facie case on his Section 1983 claim and Defendant is entitled to summary judgment on this claim.

### E.    Defendant's Motion to Strike

In his Motion to Strike, Defendant argues that certain information contained in various affidavits and interrogatory responses filed in opposition to Defendant's Motion for Summary Judgement is inadmissible. The court is capable of evaluating what evidence in the summary

judgment record is (1) relevant to the issues before it, (2) based on personal knowledge, and (3) could be admissible *at trial*.  The Motion is due to be denied.

## IV.     Conclusion

For the foregoing reasons, the court concludes that there are no genuine issues of material fact and Defendant is entitled to judgment as a matter of law on all of the claims set forth in Plaintiff's Complaint.  A separate order will be entered.

**DONE** and **ORDERED** this March 3, 2016.

R. DAVID PROCTOR

UNITED STATES DISTRICT JUDGE